**Alma L. RAMEY, Appellant,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Appellee.**

No. 94–877.

United States Court of Veterans Appeals.

April 1, 1996.

eral Counsel; and Patricia Trujillo, Washington, D.C., were on the brief for the appellee.

Before NEBEKER, Chief Judge, and KRAMER and FARLEY, Judges.

FARLEY, Judge:

This is an appeal from a June 13, 1994, decision of the Board of Veterans' Appeals (BVA or Board) which denied service connection for the cause of the death of Vernon L. Ramey, the veteran husband of the appellant. This appeal is timely and the Court has jurisdiction pursuant to 38 U.S.C. § 7252(a). For the reasons that follow, the Court will affirm the decision of the BVA.

## I.

The veteran served in the U.S. Army from April 1945 until January 1947. Record (R.) at 39. In February 1978, he was hospitalized with complaints of abdominal pain and indigestion. R. at 52. An x-ray revealed a carcinoma in the veteran's colon. R. at 55. A "scan" of the veteran's liver was conducted on February 14, 1978, and the examiner wrote: "I do not see where it is possible to differentiate here between metastatic disease and possible hepatoma, though because there are 2 lesions, metastatic disease is probably more likely." R. at 56. Metastasis is "the transfer of disease from one organ or part to another not directly connected with it. It may be due either to the transfer of pathogenic microorganisms ... or to transfer of cells, as in malignant tumors." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1023 (28th ed.1994). On February 16, 1978, Dr. Dennis L. Havens performed an exploratory laparotomy and sigmoid colostomy on the veteran, which found "an obstructing lesion in the left colon and probabl[e] liver metastasis by liver scan. It was felt that segmental colectomy and confirmation of the metastatic condition of [the] disease was indicated.... The patient had metastasis throughout the peritoneal cavity with bowel implants, peritoneal implants and several large liver metastasis." R. at 57. The veteran died on January 22, 1980, and the final diagnosis was "[d]isseminated carcinoma of the colon with abdominal carcinomatosis." R. at 83. His death certifi-

Alma L. Ramey, pro se.

Mary Lou Keener, General Counsel; Norman G. Cooper, Assistant General Counsel; R. Randall Campbell, Deputy Assistant Gen-

cate reports his cause of death as "carcinoma of colon." R. at 46.

In August 1989, the appellant filed an application for dependency and indemnity compensation or death pension. R. at 41–44. She transmitted medical records to the regional office (RO) in September 1989, and wrote in an attached letter:

You will note that through out these records reference is made to colon cancer. I do not believe that this is one of the cancers recognized on claims pertaining to radiation. At the time of his death there was no reason to try and establish whether the cancer was primary liver cancer or colon cancer that had spread. Immediately following his surgery Dr. Havens told me and other members of our family that approximately one third of my husband's liver was invaded and that he had removed an obstruction from the colon. He told us that both tumors could have started at about the same time or that they could have spread from the liver to the colon or from the colon to the liver. He said he could not determine which had started first.

R. at 49.

The RO inquired about the nature of her husband's service (R. at 88), and the appellant responded:

[My husband] told me that he had seen bodies stacked ten feet high in the streets of Nagaski [sic] and that he had stood in the area where the bomb was dropped and had seen the print of a man that had totally been disintegrated having a dark print of his body in the concrete. This was surely ground zero, a very short time after the atomic warhead had been dropped.

R. at 92. She also stated that her husband smoked "a pack [of cigarettes] or less per day." R. at 93.

In a December 1989 letter, Dr. Havens wrote:

It is my opinion that Mr. Ramey had a colon cancer and that the colon cancer was metastatic to the liver. It should be noted, however, that the liver tumor was not biopsied, thus, there is no absolute proof that

the tumor in the liver was, in fact, metastatic colon cancer.

R. at 114. Also in December 1989, VA requested a report from the Defense Nuclear Agency (DNA) regarding whether the veteran was exposed to ionizing radiation during service. R. at 110. In January 1990, the DNA responded that the veteran's service medical records had apparently been destroyed in the 1973 fire at the National Personnel Records Center in St. Louis, Missouri, and that it relied on "alternate unit records" to outline his service. The DNA continued:

A review of Army historical records has confirmed that on February 5, 1946, Mr. Ramey joined "I" Company, 188th Parachute Regiment, 11th Airborne Division stationed at Sendai, Honshu, Japan (approximately 575 miles from Hiroshima and 750 miles from Nagasaki). On February 12, 1946, Mr. Ramey was assigned temporary duty at the nearby 11th Airborne Division Jump School. Returning to his unit on March 6, 1946, Mr. Ramey remained with "I" Company, 188th Parachute Regiment at Sendai through July 31, 1946. Due to insufficient unit information, we cannot track Mr. Ramey's movements beyond this date.

In total, the available evidence does not confirm that Mr. Ramey served with either the Hiroshima or Nagasaki forces. Available unit morning reports indicate that he came no closer than 575 miles to Hiroshima and 750 miles to Nagasaki during his service in Japan. At such distances, there was no risk of exposure to radiation from the strategic atomic bombing of either city.

R. at 118. In January 1990, the regional office (RO) denied service connection for the cause of the veteran's death, finding that the appellant "was too far from Hiroshima or Nagasaki to be exposed to ionizing radiation or to participate in radiation risk activity." R. at 122. The appellant filed a Notice of Disagreement in January 1991, in which she stated that the DNA

clearly could not establish my husband's location in Japan from his arrival in the Pacific Theater of Occupation until February 6, 1946. His departure date from the United States ... was October 13, 1945

and his arrival date was November 6, 1945. I am certain [he] was in Nagasaki during this period prior to February 6, 1946. . . .

R. at 127–28.

In April 1991, the appellant submitted a VA Form 1–9, Appeal to Board of Veterans' Appeals, in which she reiterated her argument that the DNA report did not cover the time period prior to February 1946. R. at 143–44. She also attached a letter that her husband had sent to his mother on November 9, 1945, in which he stated that he had been sent to Nagasaki but they could not land there (for unspecified reasons) so they continued on to another port. R. at 149. The appellant further stated in her Form 1–9 that "the delay was for a short time, as Nagasaki was his destination, and I feel that he returned there." R. at 144.

In October 1991, the RO requested further information from the DNA, based on the information provided by the appellant. R. at 158–59. The DNA responded in November 1991 that recently obtained passenger lists from a ship which docked at Nagasaki for one day revealed that the appellant had been on board the ship. R. at 161. The DNA also reported:

A scientific dose reconstruction titled *Radiation Dose Reconstruction: U.S. Occupation Forces in Hiroshima and Nagasaki, Japan, 1945–1946* . . . has determined the maximum possible radiation dose that might have been received by any individual who was at either Hiroshima or Nagasaki for the full duration of the American occupation (September 1945 to June 1946 for Nagasaki; and September 1945 to March 1946 for Hiroshima). Using all possible "worst case" assumptions, the maximum possible dose any individual serviceman might have received from external radiation, inhalation, and ingestion is less than one rem. This does not mean that any individual approached that level of exposure. In fact, it is probable that the great majority of servicemen assigned to the Hiroshima and Nagasaki occupation forces received no radiation exposure whatsoever, and

that the highest dose received by anyone was a few tens of millirem.

R. at 161–62.

In December 1991, the RO requested an opinion from the Director of the Compensation and Pension Service of VA as to whether the claim should be allowed or denied. R. at 165. The Director of the Compensation and Pension Service in turn requested an opinion from the Chief Medical Director of VA. R. at 169–70. In March 1992, an Assistant Chief Medical Director reported:

[The veteran] is reported to have received a maximal dose of 1.0 rem irradiation at age 20. The gamma dose was reconstructed. Mr. Ramey developed adenocarcinoma of the colon some 33 years after his exposure.

. . . It is calculated that exposure to 17.0 rad or less at age 20 provides a 99 percent credibility that there is no reasonable possibility that it is as likely as not that the veteran's colon cancer is related to his exposure to ionizing radiation. . . . Information in *Health Effects of Exposure to Low Levels of Ionizing Radiation (BEIR V)*, 1990, pages 301 to 303, generally supports this value. Among Japanese A-bomb survivors no excess of colon cancer has been "evident at doses below 1.0 Gy", i.e., 100 rads, and risks have increased only after "intense irradiation".

. . . The veteran's dose was much lower than the cited value and it is highly unlikely that his disease can be attributed to exposure to ionizing radiation in service.

R. at 173. In April 1992, the Director of the Compensation and Pension Service wrote to the RO that as a result of the Assistant Chief Medical Director's opinion "and following review of the evidence in its entirety, it is our opinion that there is no reasonable possibility that the veteran's disability was the result of such exposure." R. at 175. On April 17, 1992, the RO denied the appellant's claim based on the above reports and the fact that "colon cancer is not radiopresumptive under 38 C.F.R. [§ ] 3.309[ (d) ]." R. at 177.

In a June 1992 statement, the appellant wrote that the things her husband told her about Nagasaki and his experiences there

indicated that he did land there, and that she was

> distressed that my husband's cancer is repeatedly referred to as colon cancer. At the time of discovery one-third of my husband's liver was invaded by cancer. He died when he lost so much liver function that he jaundiced and built up fluid.... Considering that the liver is the largest vital organ and that such a large area was invaded at the initial diagnosis of colon and liver cancer and only a small section of the colon was removed and rejoined it seems more probable to me that the liver was the primary source of the cancer, or at least another source unrelated.

R. at 186–88. In June 1994, the BVA held that the preponderance of the evidence was against the claim for service connection for the cause of the veteran's death. R. at 6.

## II.

Service connection for cancer or for death caused by cancer which is claimed to be attributable to radiation exposure during service can be accomplished in three different ways. First, there are 15 types of cancer which will be presumptively service connected. 38 U.S.C. § 1112(c). Second, 38 C.F.R. § 3.311(b) (1995) provides a list of "radiogenic diseases" which will be service connected provided that certain conditions specified in that regulation are met. Third, direct service connection can be established by "show[ing] that the disease or malady was incurred during or aggravated by service," a task which "includes the difficult burden of tracing causation to a condition or event during service." *Combee v. Brown*, 34 F.3d 1039, 1043 (Fed.Cir.1994). The Court will address each of these ways separately.

### A. 38 U.S.C. § 1112(c)

■ Colon cancer is not included in the fifteen types of cancer which are subject to presumptive service connection under 38 U.S.C. § 1112(c). *See* 38 U.S.C. § 1112(c)(2)(A)(M). The list does include "[p]rimary liver cancer," 38 U.S.C. § 1112(c)(2)(M), but despite the appellant's contentions to the contrary, the Board found that the veteran's death was caused by colon cancer. R. at 11. The Court must affirm

this finding of fact unless it is found to be "clearly erroneous," i.e., without a plausible basis in the record. 38 U.S.C. § 7261(a)(4); *Gilbert v. Derwinski*, 1 Vet.App. 49, 52–53 (1990). Here, there is medical evidence of record which supports the finding that the carcinoma in the veteran's liver was a result of metastasis from the colon cancer. Regarding the appellant's statement that "it seems more probable to me that the liver was the primary source of the cancer, or at least another source unrelated" (R. at 188), as a layperson, she is not competent "to offer evidence that requires medical knowledge such as a diagnosis as to the cause of a veteran's death." *Espiritu v. Derwinski*, 2 Vet.App. 492, 494 (1992).

The appellant also has contended that some of the medical evidence of record establishes that the carcinoma in the veteran's liver may have been primary liver cancer. She pointed to the February 1978 liver scan report in which the examiner wrote that he could "not see where it is possible to differentiate here between metastatic disease and possible hepatoma" (R. at 56), but the report of a sigmoid colostomy performed by Dr. Havens two days later noted that "[i]t was felt that ... confirmation of the metastatic condition of [the] disease was indicated" (R. at 57). All of the diagnoses in the record after this refer to the condition as colon cancer that metastasized into the liver, and the cause of death on the appellant's husband's death certificate was listed as colon cancer. R. at 46, 58–62, 64–65, 71–81, 83. In a December 1989 letter, Dr. Havens acknowledged that the liver tumor was not biopsied so that there was no "absolute proof that the tumor in the liver was, in fact, metastatic colon cancer," but he also stated: "It is my opinion that Mr. Ramey had a colon cancer and that the colon cancer was metastatic to the liver." R. at 114. Thus, despite the appellant's contentions, there is ample medical evidence of record to support the BVA's finding that the veteran suffered from colon cancer which metastasized into his liver. Therefore, there is a plausible basis for the BVA's finding that colon cancer caused the veteran's death, and as a result, 38 U.S.C. § 1112(c) does not apply to this case.

### B. 38 C.F.R. § 3.311(b)

For purposes of 38 C.F.R. § 3.311(b), colon cancer is considered a "radiogenic diseases." 38 C.F.R. § 3.311(b)(2)(x). Under this regulation, when it is determined that:

(i) A veteran was exposed to ionizing radiation as a result of participation in ... the occupation of Hiroshima or Nagasaki, Japan, from September 1945 until July 1946 ...;

(ii) The veteran subsequently developed a radiogenic disease; and

(iii) Such disease first became manifest within the period specified in paragraph (b)(5) of this section [for colon cancer, "5 years or more after exposure"];

the claim will then "be referred ... for further consideration in accordance with paragraph (c) of this section." 38 C.F.R. § 3.311(b)(1); see also 38 C.F.R. § 3.311(e) (listing factors to be considered when giving opinion discussed in § 3.311(b)(1)). Paragraph (c)(1) provides that "an advisory medical opinion" may be requested. 38 C.F.R. § 3.311(c)(1). Paragraph (c)(1)(ii) provides that if it is "determine[d] that the veteran's disease resulted from radiation exposure in service, the [RO shall be informed] in writing, setting forth the rationale for this conclusion." 38 C.F.R. § 3.311(c)(1)(ii).

■ Here, the RO referred the claim to the Director of the Compensation and Pension Service, who obtained an opinion from an Assistant Chief Medical Director. The Assistant Chief Medical Director opined that "exposure to 17.0 rad or less at age 20 provides a 99 percent credibility that there is no reasonable possibility that it is as likely as not that the veteran's colon cancer is related to his exposure to ionizing radiation." R. at 173. Based on this opinion, the Director of the Compensation and Pension Service recommended denying the claim. R. at 175. The Court finds that the Assistant Chief Medical Director's opinion provides a plausible basis for the Board's finding that the appellant's death from colon cancer should not be service connected under 38 C.F.R. § 3.311(b).

There is language in an opinion of the Court of Appeals for the Federal Circuit that could suggest a different interpretation of 38 C.F.R. § 3.311(b). In *Combee*, 34 F.3d at 1043, the Court stated:

Exposure alone, as a result of atmospheric testing or service in Hiroshima or Nagasaki, qualifies a veteran suffering from a *listed* disease that has become manifest within a certain latency period, for presumptive service connection. 38 C.F.R. § 3.311b (1993). In essence, the list lifts the burden of proving direct service connection and provides exposed veterans with sound scientific evaluations of the radiogenicity of their disease. For diseases listed as radiogenic, exposed veterans thus generally receive swift and uniform compensation.

Despite this possible suggestion, 38 C.F.R. § 3.311(b) does not provide presumptive service connection for "radiogenic diseases." Rather, it outlines a procedure to be followed in adjudicating a claim for service connection for such diseases (or, as in this case, for service connection for death caused by such diseases). We note that the Secretary sought clarification of this point by filing a petition for rehearing with the Federal Circuit after the *Combee* decision issued, but clarification was not forthcoming. However, such a suggestion does not appear to comport with the regulatory scheme and, in any event, would be obiter dicta because it was not essential to the actual holding in that case. See *Combee*, 34 F.3d at 1043–45; see also part II.C, *infra*. Therefore, we are not compelled to hold that 38 C.F.R. § 3.311(b) establishes a presumption of service connection for "radiogenic diseases."

### C. Direct Service Connection

As noted above, the Court of Appeals for the Federal Circuit has also determined that service connection for cancer can be pursued under the general VA compensation entitlement system. *Combee*, 34 F.3d at 1043; see 38 U.S.C. § 1110 (basic entitlement to disability compensation for wartime veterans). Since the BVA decision here was issued prior to the *Combee* opinion, the BVA did not address the question of direct service connection. However, a remand on this basis is unnecessary because the appellant has failed

to submit a well-grounded claim (*see* discussion *infra*), and because whether a claim is well grounded is a matter of law which the Court reviews under the de novo standard of review. *Grottveit v. Brown*, 5 Vet.App. 91, 92 (1993); *cf. Soyini v. Derwinski*, 1 Vet.App. 540, 546 (1991) (where BVA failed to meet the "reasons or bases" requirement of 38 U.S.C. § 7104(d)(1), Court nevertheless affirmed BVA decision because a remand "would result in this Court's unnecessarily imposing additional burdens on the BVA and [ ]VA with no benefit flowing to the veteran").

Generally, there is an initial threshold which must be met in order to obtain VA benefits: the claimant must "submit[ ] evidence sufficient to justify a belief by a fair and impartial individual that the claim is well grounded." 38 U.S.C. § 5107(a). "A well[-]grounded claim is a plausible claim, one which is meritorious on its own or capable of substantiation. Such a claim need not be conclusive but only possible to satisfy the initial burden of [section 5107(a) ]." *Murphy v. Derwinski*, 1 Vet.App. 78, 81 (1990). In *Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), in the context of a veteran's claim for service connection, the Court stated:

> [I]n order for a claim to be well grounded, there must be competent evidence of current disability (a medical diagnosis) . . .; of incurrence or aggravation of a disease or injury in service (lay or medical evidence) . . .; and of a nexus between the in-service injury or disease and the current disability (medical evidence). . . .

(Citations omitted.)

■ Regarding claims for service connection for the cause of death of a veteran, the first requirement, evidence of a current disability, will always have been met (the current disability being the condition that caused the veteran to die), but the last two requirements must be supported by evidence of record. It is debatable whether or not the second requirement has been met, but even assuming it has been, the appellant has failed to present *medical* evidence of a connection between the veteran's death and the claimed inservice radiation exposure. In fact, the only medical evidence of record that address-

es this issue was the Assistant Chief Medical Director's opinion, which supports denial of the appellant's claim. Accordingly, the appellant's claim for direct service connection for the veteran's death is not well grounded.

### III.

Upon consideration of the record, the appellant's informal brief, and the Secretary's brief, the Court holds that the appellant has not demonstrated that the Board committed either factual or legal error which would warrant reversal or remand. *Gilbert, supra; see also Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Danville Plywood Corp. v. United States*, 899 F.2d 3 (Fed.Cir.1990). Therefore, the June 13, 1994, decision of the Board of Veterans' Appeals is AFFIRMED.