**LaVeina C. DAVIS, Appellant,**

v.

**Togo D. WEST, Jr., Secretary of Veterans Affairs, Appellee.**

No.  97–1057.

United States Court of Appeals for Veterans Claims.

Nov. 19, 1999.

Kenneth M. Carpenter was on the brief for the appellant.

John H. Thompson, Acting General Counsel; Ron Garvin, Assistant General Counsel; Mary Ann Flynn, Acting Deputy Assistant General Counsel; and James L. Calis were on the brief for the appellee.

Before HOLDAWAY, STEINBERG, and GREENE, Judges.

HOLDAWAY, Judge:

The appellant, LaVeina C. Davis, widow of veteran Lloyd E. Davis, appeals from two Board of Veterans' Appeals (Board or BVA) decisions. In the first decision, dated March 6, 1997, the Board denied the appellant's claim for service connection of the veteran's death from cardiorespiratory failure due to lung cancer and gastrointestinal bleeding. In November 1997, the Court granted the parties' joint motion for remand and vacated that part of the Board's decision that denied service connection for the veteran's cause of death as a result of cigarette smoking and remanded that matter for readjudication. The issue of service connection of the veteran's death from lung cancer due to exposure to ionizing radiation remained before the Court. In the second BVA decision, dated April 8, 1998, the Board denied the appellant's claim for service connection of the veteran's cause of death due to cigarette smoking. In an order dated May 7, 1998, the Court consolidated the two appeals under the current docket number. The Court has jurisdiction of the case under 38 U.S.C. § 7252(a). For the following reasons, the Court will affirm the decision of the Board.

## I. FACTS

The veteran served on active duty from October 1938 to April 1960. R. at 152, 163. He was aboard the U.S.S. *Curtiss* during Operation Sandstone, which consisted of three atmospheric nuclear tests during April and May 1948. He was responsible

for retrieving film from camera towers after the explosions.

The veteran died in January 1979. His death certificate listed the immediate cause of death as cardiorespiratory failure due to a metastatic bronchogenic carcinoma of the lung and gastrointestinal bleeding. The death certificate also indicated that the veteran's lung cancer had had its onset two months prior to death. At the time of the veteran's death, service connection had been established for asymptomatic ureterolithiasis, residuals of a healed fracture of the right fibula, residuals of a healed fracture of the right zygoma, bilateral defective hearing, bilateral tinnitus, and eustachian salpingitis. Each service-connected condition had been rated non-compensable.

In May 1979, Robert E. Fornal, M.D., a major in the Air Force Medical Corps, who apparently had treated the veteran before his death, sent the appellant a letter discussing the possible etiology of the veteran's lung cancer. Dr. Fornal noted that the veteran had related that he had been involved in nuclear weapons testing, that his job was to retrieve film from cameras placed near blast zones, and that his clothing had been confiscated after a "survey" with a radiation detector. The doctor also noted that the veteran had had a history of smoking thirty packs of cigarettes per year, but that the veteran had not smoked for seven years prior to hospitalization. The doctor stated that the relationships between (1) cigarette smoking and cancer and (2) "the deposit of long-lived radioactive particulate material in the bronchial tree and the development of lung tumors in animals" had been proven. He opined that it would take two to three decades after the deposit of radioactive material before clinical signs of cancer would be manifest. He also stated: "There are reports which suggest that radiation exposure among uranium workers and cigarette smoking produces more lung cancer than simply adding the risks would lead one to predict." In conclusion, Dr. Fornal

stated the following: "I know of no way to prove that your husband's tumor was induced by radioactivity deposited in the 1940's. On the other hand, neither do I know of any way to conclusively state that the exposure and the tumor were not related."

During a July 1981 VA field examination, the appellant indicated that the veteran had smoked less than a pack per day of cigarettes and that he had ceased smoking in 1968. In a subsequent letter to VA, the appellant stated that the veteran was smoking when she met him in 1956, but that she did not know when he began smoking.

Initial reports from the Department of the Air Force and the Department of the Navy indicated that the veteran had received 0.110 rem, with an upper range of 0.190 rem, exposure to radiation during Operation Sandstone. However, a July 1983 memorandum from the Department of the Air Force revised the dose estimate because there had been a rainout of fission debris during one of the explosions. The dose estimate was increased to 0.880 rem; a 0.770 increase for the rainout was added to the film-badge estimate. In January 1992, the Defense Nuclear Agency (DNA) issued a memorandum stating that three film badges that had been issued to the veteran during testing had had greater than zero readings. The readings were twenty-seven millirems, fifty millirems, and eight millirems. The DNA estimated the upper limit of the veteran's overall exposure to radiation to be 0.225 rem.

In August 1989, the appellant procured the opinion of Charles T. Hinshaw, Jr., M.D., who opined "that there is a reasonable medical probability that the occurrence of bronchogenic adenocarcinoma of the lung in this veteran was either caused or contributed to substantially by radiation exposure." Dr. Hinshaw summarized the bases of his opinion as follows:

(1) there is a well[-]documented link between radiation exposure and an in-

creased incidence of carcinoma of the lung;

(2) the histologic type of carcinoma of the lung most frequently associated with radiation exposure is bronchogenic adenocarcinoma, exactly as diagnosed in this veteran;

(3) there is a widely recognized lessening of the risk of carcinoma of the lung with each ensuing year of smoking abstinence (this veteran had not smoked for seven years); [and]

(4) the histologic type of carcinoma of the lung most commonly associated with smoking was not the cell type found in this veteran.

Also in January 1992, Susan H. Mather, M.D., M.P.H., the VA Assistant Chief Medical Director for Environmental Medicine and Public Health, citing statistical studies, stated: "For non[ ]smokers, it is calculated that exposure to 9.3 rad or less at age 30 provides a 99[%] credibility that there is no reasonable possibility that it is as likely as not that the veteran's lung cancer is related to his exposure to ionizing radiation." Dr. Mather also criticized the opinion of Dr. Hinshaw for ignoring "the dose of ionizing radiation received as a factor in carcinogenesis." In February 1992, relying on Dr. Mather's opinion, the Director of VA's Compensation and Pension Service found that there was no reasonable possibility that the cause of the veteran's death was related to in-service exposure to radiation.

In response, Dr. Hinshaw, in June 1992, criticized the opinion of Dr. Mather because it was based on statistics for nonsmokers. He stated that the veteran had died of a "specific histologic type of lung carcinoma which develops in smokers who have low dose radiation exposure." He also stated that there was no lower limit threshold below which solid tumors cannot occur, but that such tumors fit in a pattern of decreasing effect with decreasing doses.

In November 1994, the DNA issued another memorandum discussing the veteran's dose estimate for radiation exposure in service. The DNA explained that the original 0.110 rem estimate from the Department of the Air Force was based on an inappropriate method of reading the veteran's film badge. The DNA also explained that the dose estimate of 0.880 rem included fallout which was in an area different from where the veteran had been located. The DNA concluded that the appropriate estimate, including a reconstruction of unbadged periods, was 0.276 rem. According to a DNA policy, the dose estimate was rounded to 0.3 rem.

In February 1995, Dr. Mather reviewed the veteran's case based on the newly submitted dose estimate from the DNA and again concluded that it was "unlikely that the veteran's lung cancer can be attributed to exposure to ionizing radiation in service." In addition, she added that she had used statistics for nonsmokers because the veteran had stopped smoking more than five years prior to the diagnosis of lung cancer. She also explained "that the radiogenic versus non[ ]radiogenic etiology of a given cancer cannot be ascertained histologically" and that adenocarcinoma of the lung may be related to smoking and can occur without exposure to radiation.

In August 1995, the Board procured an independent medical opinion (IMO) from John K. Hayes, Jr., M.D., Associate Professor and Director of the Radiation Therapy Division, at the University of Utah. Dr. Hayes opined that the veteran's personal risk of lung cancer from his in-service radiation exposure was less than two chances in 100,000. He added that to double the veteran's personal risk of lung cancer, the veteran's dose of radiation exposure would have to be 600 times the veteran's upper-bound estimate. He also stated that the veteran's risk of lung cancer from cigarette smoking was much higher than his risk from ionizing radiation and that there would be a significant decrease in risk from cigarette smoking after ten years of cessation. Dr. Hayes criticized points of Dr. Hinshaw's opinion as

irrelevant, misleading, or patently incorrect. In conclusion, Dr. Hayes stated:

> With the data available, it is not possible to say that radiation did not contribute to the development of this patient's lung cancer. However, it is clear from the scientific literature that his risk of developing adenocarcinoma of the lung was far greater because of his cigarette smoking than it was from the exposure to ionizing radiation in military service.

A second IMO was obtained, in September 1996, from Oscar E. Streeter, Jr., M.D., Assistant Professor and Chief Physician, in the Department of Radiation Oncology at the University of Southern California. After a review of the veteran's case and relevant medical studies, he opined: "It is[,] therefore, not possible to say that this veteran's low radiation exposure contributed to this patient's lung cancer, though it is clear that [the veteran's] risk of developing adenocarcinoma of the lung was far greater from cigarette smoking." Dr. Streeter also criticized the bases of Dr. Hinshaw's opinion because (1) the data relied on by Dr. Hinshaw related to persons who had been exposed to at least 100 times greater radiation than the veteran and (2) Dr. Hinshaw's analogy to radon inhalation had no scientific validity in the veteran's case.

In the March 1997 BVA decision, the Board concluded that the veteran's death was related to cigarette smoking rather than exposure to ionizing radiation. In doing so, the Board relied upon the expert medical opinions of Drs. Mather, Hayes, and Streeter, finding them more credible and probative than the opinion of Dr. Hinshaw. In the April 1998 BVA decision, the Board concluded that the claim to establish service connection for the veteran's cause of death as related to cigarette smoking was not well grounded. The Board reached this decision because (1) applying the criteria in VA Office of General Counsel Precedent Opinion (G.C. Prec.Op.) 19–97 (May 13, 1997), there was no competent evidence that the veteran acquired a nicotine dependence during service, and (2) applying the criteria in G.C. Prec. Op. 2–93 (January 13, 1993), there was no competent medical evidence suggesting that the veteran's lung cancer resulted from cigarette smoking during service rather than cigarette smoking when the veteran was not in service.

## II. ANALYSIS

■ A surviving spouse of a qualifying veteran who died of a service-connected disability is entitled to payments of dependency and indemnity compensation (DIC). *See* 38 U.S.C. § 1310; *Hanna v. Brown*, 6 Vet.App. 507, 510 (1994). A veteran's death will be considered service connected where a service-connected disability was either the principal or a contributory cause of death. *See* 38 U.S.C. § 3.312(a) (1998). "Service connected" means that either a disability was incurred or aggravated, or death was caused by a disability incurred or aggravated, during active duty service. *See* 38 U.S.C. § 101.

### A. Cigarette Smoking

■ "[A] person who submits a claim for benefits under a law administered by the Secretary shall have the burden of submitting evidence sufficient to justify a belief by a fair and impartial individual that the claim is well grounded." 38 U.S.C. § 5107(a). Therefore, a DIC claim must be well grounded. *See Johnson v. Brown*, 8 Vet.App. 423, 426 (1995). A well-grounded claim is "a plausible claim, one which is meritorious on its own or capable of substantiation. Such a claim need not be conclusive but only possible to satisfy the initial burden of [§ 5107(a) ]." *Murphy v. Derwinski*, 1 Vet.App. 78, 81 (1990). For a service-connection claim to be well grounded, a claimant must submit each of the following: (1) a medical diagnosis of a current disability; (2) medical evidence, or in certain circumstances lay evidence, of in-service incurrence or aggravation of a disease or injury; and (3) medical evidence of a nexus between the

in-service injury or disease and the current disability. *See Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed.Cir.1996) (table). Where the determinative issue involves medical causation or a medical diagnosis, competent medical evidence to the effect that the claim is "plausible" is generally required. *See Grottveit v. Brown*, 5 Vet.App. 91, 93 (1993). A BVA decision on whether a claim is well grounded is a question of law which this Court reviews de novo. *See Caluza*, 7 Vet.App. at 505. The truthfulness of the evidence is presumed when determining whether a claim is well grounded. *See Robinette v. Brown*, 8 Vet. App. 69, 75–76 (1995); *King v. Brown*, 5 Vet.App. 19, 21 (1993).

In G.C. Prec. Op. 2–93, the Secretary concluded that (1) a determination of whether nicotine dependence may be considered a disease or injury for disability compensation was an adjudicative matter to be made based on accepted medical principles and (2) service connection may be established for a disability or death if the evidence establishes that the underlying disease or injury was caused by tobacco use during service. In G.C. Prec. Op. 19–97, the Secretary determined that secondary service connection for death or disability attributable to tobacco use subsequent to military service could be established based on nicotine addiction that had arisen in service if the addiction was the proximate cause of the death or disability. That opinion noted that the VA Under Secretary for Health had determined that nicotine dependence may be considered to be a disease for the purpose of VA disability compensation. The BVA is statutorily bound to follow the precedential opinions of the VA Office of General Counsel. *See* 38 U.S.C. § 7104(c). However, this Court is not. *See* 38 U.S.C. § 7261; *Sabonis v. Brown*, 6 Vet.App. 426, 429 (1994).

"Service connection may be granted for any disease diagnosed after discharge, when all of the evidence, including that pertinent to service, establishes that the disease was incurred in service." 38 C.F.R. § 3.303(d) (1998). "Disability which is proximately due to or the result of a service-connected disease or injury shall be service connected." 38 C.F.R. § 3.310(a) (1998).

■ The veteran died in 1979 of cardiorespiratory arrest, and the primary cause of his death was lung cancer. He was first diagnosed with lung cancer two months before his death. The majority of the medical evidence of record indicates that the veteran's lung cancer was most likely caused by smoking. The appellant stated that when she met the veteran in 1956, he was already smoking. Also, it appears that the veteran permanently quit smoking at some point between 1968 and 1970, eight to ten years after his discharge from service in 1960. The appellant has not submitted a well-grounded claim for direct service connection for the cause of the veteran's death because there is no medical evidence that suggests in any way that the veteran incurred lung cancer in service or that there exists an etiological relationship between his lung cancer and *in-service* smoking. *See Caluza* and *Grottveit*, both *supra*; 38 C.F.R. § 3.303(d). The appellant argues that it is impossible to obtain a medical opinion regarding whether the veteran's in-service or postservice smoking caused his lung cancer. That may be true, but it is, under the circumstances of this case, irrelevant. Congress has provided several methods of assisting certain veterans in overcoming difficult evidentiary burdens in relation to exposure to harmful substances in service. *See, e.g.*, 38 U.S.C. § 1112(c) (relating to radiation exposure); 38 U.S.C. § 1116 (relating to exposure to certain herbicides). In this case, as to carcinogens ingested by cigarette smoking, no such provision exists; therefore, it is the claimant's burden to submit medical evidence of a plausible nexus between in-service smoking and a subsequent diagnosis of lung cancer. Moreover, even in cases where a disability is presumed service connected because of in-

service exposure to ionizing radiation or Agent Orange, an intercurrent cause can rebut the presumption of service connection. *See* 38 C.F.R. §§ 3.307(d), 3.309(d), (e). Similarly, in this case the effect of postservice smoking, as an intercurrent cause, is relevant to the question of etiology between in-service smoking and a postservice diagnosis of lung cancer.

■ The appellant has also not submitted a well-grounded claim for secondary service connection of the veteran's lung cancer from smoking, including postservice smoking, due to nicotine addiction because the veteran was never diagnosed with having incurred nicotine addiction in service. *See Caluza* and *Grottveit*, both *supra.* The appellant argues that nicotine dependence can be demonstrated based on the veteran's long history of smoking. However, nicotine dependence is a medical question that must be answered by a medical opinion or diagnosis. *See Grottveit, supra.* Although a medical professional might render such an opinion after the veteran's discharge from service, based on past medical history, there is no such medical evidence in the record on appeal. In view of the absence of a statutory presumption as to cigarette smoking and in view of the fact that the veteran's postservice smoking represents a possible intercurrent cause of his lung cancer, the Court, although sympathetic to the appellant's plight, must apply the well-groundedness requirements here just as it would in the case of any other VA claimant. Accordingly, the Court will affirm the Board's decision that the appellant's claim for service connection of the veteran's death due to lung cancer caused by cigarette smoking is not well grounded.

### B. Exposure to Ionizing Radiation

■ A BVA determination about whether death or disability is service connected is a finding of fact subject to the "clearly erroneous" standard of review. *See Horowitz v. Brown,* 5 Vet.App. 217, 221 (1993). " 'A finding of fact is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.' " *Gilbert v. Derwinski,* 1 Vet. App. 49, 52 (1990) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). "[T]his Court is not permitted to substitute its judgment for that of the BVA on issues of material fact; if there is a 'plausible' basis in the record for the factual determinations of the BVA, . . . [the Court] cannot overturn them." *Gilbert,* 1 Vet.App. at 53. The Court will also defer to the Board's determinations regarding the credibility of the evidence if there is a plausible basis for the Board's determination and it is supported by an adequate statement of reasons and bases. *See Coghill v. Brown,* 8 Vet.App. 342, 345 (1995); *Owens v. Brown,* 7 Vet.App. 429, 433 (1995).

■ The Court has summarized the law on service connection for exposure to ionizing radiation as follows:

First, there are 15 types of cancer which are presumptively service connected. 38 U.S.C. § 1112(c). Second, 38 C.F.R. § 3.311(b) (1998) provides a list of "radiogenic diseases" which will be service connected provided that certain conditions specified in that regulation are met. Third, direct service connection can be established by "show[ing] that the disease or malady was incurred during or aggravated by service," a task which "includes the difficult burden of tracing causation to a condition or event during service."

*Ramey v. Brown,* 9 Vet.App. 40, 44 (1996) (quoting *Combee v. Brown,* 34 F.3d 1039, 1043 (Fed.Cir.1994)), *aff'd sub nom. Ramey v. Gober,* 120 F.3d 1239 (Fed.Cir. 1997).

Adenocarcinoma of the lungs is not one of the fifteen cancers subject to the presumption of service connection for exposure to ionizing radiation during service. *See* 38 U.S.C. § 1112; 38 C.F.R.

§ 3.309(d). However, it is a "radiogenic disease" covered under section 3.311(b). The appellant has not disputed that all the required development under section 3.311 was undertaken by the Secretary. Instead, she argues that the evidence, for and against an etiological relationship between radiation exposure in service and the veteran's lung cancer, is in equipoise and that her claim for service connection should have been granted.

In this matter, Drs. Mather, Streeter, and Hayes all found that based on the veteran's exposure to radiation during service, it was extremely unlikely that the lung cancer was caused by his level of radiation exposure. Although Dr. Hayes stated that it was not possible to rule out definitively that radiation exposure contributed to the veteran's lung cancer, he also noted that there were less than 2 chances in 100,000 that such an association existed. Therefore, based on the above medical opinions, any medical nexus between the veteran's in-service exposure to ionizing radiation and his fatal lung cancer was speculative at best. While Dr. Hinshaw did opine that it was probable that the veteran's cancer was related to radiation exposure, Drs. Mather, Streeter, and Hayes strongly criticized his opinion as lacking scientific validity. Therefore, there was a plausible basis in the record for the Board's decision to discount Dr. Hinshaw's opinion and give more weight to the experts who found that there was no tenable relationship between the veteran's in-service exposure to radiation and his development of lung cancer. *See Coghill, Owens,* and *Gilbert,* all *supra.*

### III. CONCLUSION

After consideration by the Court of the briefs of the parties and a review of the record on appeal, the March 1997 and April 1998 decisions of the BVA are AFFIRMED.