Citation Nr: 1532793 
Decision Date: 07/31/15 Archive Date: 08/05/15

DOCKET NO. 10-19 537 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Cleveland, Ohio


THE ISSUES

1. Entitlement to an increased rating for posttraumatic stress disorder (PTSD), evaluated as 30 percent disabling prior to October 21, 2014, and 50 percent disabling thereafter.

2. Entitlement to service connection for arthritis of the right knee, as secondary to service-connected scar, residuals of a shell fragment wound of the right calf and ankle.

3. Entitlement to service connection for arthritis of the left knee, as secondary to service-connected scar, residuals of a shell fragment wound of the right calf and ankle.

4. Entitlement to service connection for a back disability, as secondary to service-connected scar, residuals of a shell fragment wound of the right calf and ankle.

5. Entitlement to service connection for erectile dysfunction, including a prostate disorder, to include as secondary to service-connected PTSD and medication thereof. 

6. Entitlement to a total rating based on individual unemployability (TDIU) due to service-connected disabilities


REPRESENTATION

Veteran represented by: Military Order of the Purple Heart of the U.S.A.


ATTORNEY FOR THE BOARD

L. Pelican, Associate Counsel


INTRODUCTION

The Veteran served on active duty from June 1967 to June 1969.

These matters come before the Board of Veterans' Appeals (the Board) from October 2008 and September 2011 rating decisions of a Department of Veterans Affairs (VA) Regional Office (RO) in Cleveland, Ohio.

This appeal was processed using the Virtual VA and Veterans Benefits Management System (VBMS) paperless claims processing systems. Accordingly, any future consideration of this case should take into consideration the existence of these electronic records.

Pursuant to the Veteran's request, a videoconference hearing before a member of the Board was scheduled for May 2014. However, in an April 2014 statement, the Veteran requested to cancel his hearing. Under these circumstances, the regulations consider the hearing request to have been withdrawn. 38 C.F.R. § 20.704 (e) (2014).

This case was before the Board in July 2014 when it was remanded for additional development. With respect to the erectile dysfunction and left knee claims, that development has not been completed, and those issues must once again be remanded for the requested development. Stegall v. West, 11 Vet. App. 268, 271 (1998). 

The issues of entitlement to service connection for erectile dysfunction and left knee arthritis, and entitlement to TDIU, are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. The preponderance of the evidence shows that the Veteran's current right knee arthritis was first diagnosed more than one year after separation from service, and is against finding that the Veteran's current right knee disability is etiologically related to a disease, injury, or event in service or to his service-connected scar, residuals of a shell fragment wound of the right calf and ankle.

2. The preponderance of the evidence shows that the Veteran's current DJD and degenerative disc disease (DDD) of the spine, as well as Grade 1 spondylolisthesis of L4 on L5 was first diagnosed more than one year after separation from service, and is against finding that the Veteran's back disability is etiologically related to a disease, injury, or event in service or to his service-connected scar, residuals of a shell fragment wound of the right calf and ankle.

3. For the entire period on appeal, the preponderance of the evidence shows that the Veteran's PTSD has been manifested by frequent depression (at times, severe), anxiety, and irritability, chronic passive suicidal ideation, angry outbursts, strained social relationships and an inability to trust or grow close to others, sleep impairment, and mild difficulty with concentration, attention, and memory, which more closely approximate occupational and social impairment with deficiencies in most areas. Symptoms similar in nature or severity to gross impairment in thought processes or communication, persistent delusions or hallucinations, grossly inappropriate behavior, persistent danger of hurting self or others, intermittent inability to perform activities of daily living, disorientation to time or place, or memory loss for names of close relatives, own occupation, or own name to such a degree that the Veteran had total occupational and social impairment, have not been shown.


CONCLUSIONS OF LAW

1. A right knee disability was not caused or aggravated by service-connected scar, residuals of a shell fragment wound of the right calf and ankle, nor incurred in or aggravated by service, and may not be so presumed. 38 U.S.C.A. §§ 1101, 1110, 1112, 1113, 5107 (West 2014); 38 C.F.R. §§ 3.303, 3.307, 3.309 (2014).

2. A back disability was not caused or aggravated by service-connected scar, residuals of a shell fragment wound of the right calf and ankle, nor incurred in or aggravated by service, and may not be so presumed. 38 U.S.C.A. §§ 1101, 1110, 1112, 1113, 5107 (West 2014); 38 C.F.R. §§ 3.303, 3.307, 3.309 (2014).

3. For the entire period on appeal, the criteria for a disability rating of 70 percent, but no higher, for PTSD have been met or approximated. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.321, 3.400, 4.1, 4.2, 4.7, 4.21, 4.41, 4.126, 4.130, Diagnostic Code 9411 (2014).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Board has reviewed all the evidence in the Veteran's claims file. Although the Board has an obligation to provide reasons and bases supporting this decision, there is no need to discuss, in detail, all the evidence submitted by or on behalf of the Veteran. See Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000) (noting that the Board must review the entire record, but does not have to discuss each piece of evidence). The analysis below focuses on the most salient and relevant evidence and on what this evidence shows, or fails to show, on the claims. The Veteran must not assume that the Board has overlooked pieces of evidence that are not explicitly discussed herein. See Timberlake v. Gober, 14 Vet. App. 122 (2000) (explaining that the law requires only that the Board address its reasons for rejecting evidence favorable to the Veteran).

Stegall Considerations

As noted above, the Board remanded this case in July 2014. Specifically, the Board directed that AOJ send the Veteran a VA Form 21-4142 to authorize the release of any private treatment records, schedule the Veteran for a VA PTSD examination, with a request for an opinion on whether the Veteran's claimed erectile dysfunction was caused or aggravated by his PTSD medication, to obtain addendum opinions on whether the Veteran's bilateral knee disabilities or his back disability had been permanently aggravated by service-connected disability, and to issue a Supplemental Statement of the Case (SSOC) on any claims not granted in full. 

Subsequently, the Veteran was mailed a VA Form 21-4142, he was afforded a VA PTSD examination in October 2014, and the requested addendum opinions were obtained regarding the Veteran's knee and back claims. As to the claims adjudicated below, a SSOC was issued in March 2015. Thus, there is compliance with the Board's remand instructions. See Stegall v. West, 11 Vet. App. 268, 271 (1998) (noting that where the remand orders of the Board are not complied with, the Board errs as a matter of law when it fails to ensure compliance).

Duties to Notify and Assist

VA satisfied its duty to notify the Veteran pursuant to the Veterans Claims Assistance Act of 2000 (VCAA). 38 U.S.C.A. §§ 5100, 5102-5103A, 5106, 5107, 5126 (West 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a), 4.2 (2014).

The VCAA requires VA to assist a claimant at the time he or she files a claim for benefits. As part of this assistance, VA is required to notify claimants of the evidence that is necessary, or would be of assistance, in substantiating their claim, and provide notice that a disability rating and an effective date for the award of benefits will be assigned if service connection is awarded. 38 U.S.C.A. § 5103(a) (West 2014); 38 C.F.R. § 3.159(b)(1) (2014); Quartuccio v. Principi, 16 Vet. App. 183, 187 (2002); Dingess v. Nicholson, 19 Vet. App. 473, 486 (2006).

All notice under the VCAA should generally be provided prior to an initial decision on a claim by the agency of original jurisdiction (AOJ). Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006); Pelegrini v. Principi, 18 Vet. App. 112 (2004).

Letters from VA dated in April and June 2008 notified the Veteran of how to substantiate a service connection claim on direct and secondary bases. The letters notified the Veteran of the allocation of responsibilities between himself and VA, and of how ratings and effective dates are assigned. Therefore, the duty to notify is satisfied.

In a claim for an increased disability rating, the VCAA requirement is general notice, that is, the type of evidence needed to substantiate the claim, namely, evidence demonstrating a worsening or increase in severity of the disability and the effect that worsening has on employment, as well as general notice regarding how disability ratings and effective dates are assigned. Vazquez-Flores v. Shinseki, 580 F.3d 1270 (Fed. Cir. 2009).

Here, prior to the decision on appeal, a letter from VA dated March 2011 notified the Veteran of what evidence must be shown to support an increased rating claim and informed him of his and VA's respective responsibilities for obtaining relevant records and other evidence in support of his claim. This letter also provided an explanation of how VA determines disability ratings and effective dates. Therefore, the duty to notify is satisfied.

VA's duty to assist under the VCAA includes helping the claimant obtain service treatment records and other pertinent records, as well as performing an examination or obtaining a medical opinion when one is necessary to make a decision on the claim. See 38 U.S.C.A. § 5103A (West 2014); 38 C.F.R. § 3.159(c) (2014). Here, the Veteran's service treatment records, including records from hospitalization at Quantico, and VA medical records are in the claims file. He has not identified any other records or evidence that remains outstanding. Thus, the duty to obtain relevant records on the Veteran's behalf is satisfied. See 38 C.F.R. § 3.159(c) (2014).

The Veteran was provided VA knee and back examinations in January 2010 and October 2014. As will be discussed in greater detail below, the examiners reviewed the Veteran's past medical history, considered the Veteran's present complaints, examined the Veteran, and provided opinions supported by rationales such that the Board can render an informed determination on the claims. The Board, therefore, concludes that the examination reports are adequate for the purposes of rendering a decision in the instant appeal. See 38 C.F.R. § 4.2 (2014); see also Barr v. Nicholson, 21 Vet. App. 303, 312 (2007).

With respect to claims for increased ratings, the duty to assist includes, when appropriate, the duty to conduct a thorough and contemporaneous examination of the Veteran. See Green v. Derwinski, 1 Vet. App. 121 (1991). In addition, where the evidence of record does not reflect the current state of the Veteran's disability, a VA examination must be conducted. See Schafrath v. Derwinski, 1 Vet. App. 589 (1991); 38 C.F.R. § 3.327(a) (2014).

The RO provided the Veteran VA examinations in April 2011 and October 2014. The examination reports are thorough and supported by the other evidence of record. The examination reports discussed the clinical findings and the Veteran's reported history as necessary to rate the disability under the applicable rating criteria. The examination reports also discussed the impact of the PTSD on the Veteran's daily living. They are, therefore, adequate. See Barr v. Nicholson, 21 Vet. App. 303, 312 (2007) (noting that when VA undertakes to provide a VA examination or obtain a VA opinion, it must ensure that the examination or opinion is adequate).

The Board additionally observes that all appropriate due process concerns have been satisfied. See 38 C.F.R. § 3.103 (2014). The Veteran declined the opportunity to present testimony before a Veterans Law Judge. The Veteran has been accorded the opportunity to present evidence and argument in support of his claims. Thus, the Board finds that VA has satisfied its duties to inform and assist the Veteran at every stage of this case, and may proceed to the merits of the Veteran's claims.

Service Connection Legal Criteria

In general, service connection may be granted for a disability or injury incurred in or aggravated by active military service. 38 U.S.C.A. § 1110 (West 2014); 38 C.F.R. § 3.303 (2014).

For veterans who have served 90 days or more of active service during a war period or after December 31, 1946, certain chronic disabilities, including DJD or arthritis, are presumed to have been incurred in service if manifest to a compensable degree within one year of discharge from service. 38 U.S.C.A. §§ 1101, 1112, 1137 (West 2014); 38 C.F.R. §§ 3.307, 3.309 (2014). In the instant case, there is no presumed service connection because the Veteran's arthritis did not manifest to a compensable degree within one year of service and, indeed, the first evidence of a diagnosis of the arthritis of the right knee or back in the record is in January 2010.

In the absence of presumptive service connection, to establish a right to compensation for a present disability on a direct basis, there must be (1) medical evidence of a current disability; (2) medical, or in certain circumstances, lay evidence of in-service incurrence or aggravation of a disease or injury; and (3) evidence of a nexus between the claimed in-service disease or injury and the current disability. Hickson v. West, 12 Vet. App. 247, 253 (1999).

Service connection may also be granted for a disability that is proximately due to or aggravated by a service-connected disease or injury. 38 C.F.R. § 3.310 (2014); Allen v. Brown, 1 Vet. App. 439 (1995) (holding that service connection on a secondary basis requires evidence sufficient to show that the current disability was caused or aggravated by a service-connected disability). To establish secondary service connection, there must be (1) evidence of a current disability; (2) evidence of a service-connected disability; and (3) nexus evidence establishing a connection between a service-connected disability and the current disability. See Wallin v. West, 11 Vet. App. 509 (1998).

Service Connection - Right Knee

The Veteran asserts that his present right knee disability is the result of his service-connected scar, residuals of a shell fragment wound of the right calf and ankle. 

The Veteran has a current diagnosis of DJD of the right knee, satisfying the first Wallin element. Moreover, the Veteran is service-connected for scar, residuals of a shell fragment wound of the right calf and ankle, thereby meeting the second Wallin element.

The Veteran was afforded VA examinations in January 2010 and October 2014. After examining the Veteran, the October 2014 VA examiner concluded that the Veteran's right knee disability was less likely than not caused or permanently aggravated by his service-connected scar, residuals of a shell fragment wound of the right calf and ankle. The examiner reasoned that the weight of medical literature did not support a nexus between residuals of a shell fragment wound of the right calf and ankle and the later development of DJD of the knees. The examiner further indicated that there was no knee disability noted at the time of separation from service, nor was one evident until many years after service. As to the question of aggravation, the examiner explained that there was no evidence of a significant gait abnormality or leg length discrepancy that would be of sufficient magnitude to cause biomechanical abnormalities resulting from his service-connected residuals, and that those residuals are not severe enough to cause such an abnormality. The examiner continued, stating that there was no objective evidence demonstrating that the Veteran's right knee was aggravated by his right leg wounds, and that his present right knee DJD was likely due to age-related changes, occupational or sports-related activities, repetitive knee stresses or activities, obesity, lifestyle, and genetic factors. 

The Veteran submitted several lay statements asserting a relationship between his service-connected residuals and his right knee DJD. Specifically, the Veteran asserted that he walked with a limp for several years due to his service-connected residuals, and that his knee disability is due to an irregular gait caused by greater strain. See October 2007 and January 2008 statements. Moreover, the Veteran asserted that he was told by Dr. Waters, a physician who treated his right leg injuries during service, he would walk with an altered gait for the rest of his life. See December 2008 statement and May 2010 VA Form 9. With respect to the statements regarding the etiology of his right knee disability, the Veteran as a layperson has not been shown to be capable of making medical conclusions, especially as to complex medical diagnoses or establishing a link between two medical conditions. See Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007) (explaining in footnote 4 that an appellant is competent to provide a diagnosis of a simple condition such as a broken leg, but not competent to provide evidence as to more complex medical questions); see also Layno v. Brown, 6 Vet. App. 465 (1994) (cautioning that lay testimony that the Veteran suffered a particular illness (bronchial asthma) was not competent evidence because matter required medical expertise). As to the Veteran's statements regarding Dr. Waters' opinion, the Board notes the Veteran's treatment records for the period in question, including those from Dr. Waters, contain no mention by Dr. Waters or any other physician of a limp or irregular gait resulting from his in-service injuries. His June 1968 discharge note indicated that the Veteran was discharged to duty with "all wounds well-healed;" no mention of a limp or altered gait was made. Additionally, the Veteran's June 1969 separation examination contained no indication of an irregular gait or limp. Moreover, a December 1969 VA examination report indicated the Veteran had no loss of motion in his right ankle or leg, and that there was "no disability whatsoever." Even assuming the veracity of the Veteran's assertions as to what he claims to have been told by Dr. Waters, the October 2014 VA examiner explicitly found no objective evidence showing the existence of an altered gait of sufficient severity so as to cause the Veteran's right knee DJD. Thus, given the Veteran's lack of demonstrated medical expertise, the Board finds the opinion of the October 2014 VA examiner to be the most probative evidence of record regarding the relationship between the Veteran's service-connected residuals and his right knee DJD.

Notwithstanding the foregoing discussion regarding secondary service connection, the United States Court of Appeals for the Federal Circuit (Federal Circuit) has determined that a claimant is not precluded from establishing service connection with proof of direct causation. Combee v. Brown, 34 F.3d 1039, 1042 (Fed. Cir. 1994); Ramey v. Brown, 9 Vet. App. 40, 44 (1996), aff'd sub nom. Ramey v. Gober, 120 F.3d 1239 (Fed. Cir. 1997), cert. denied, 118 S. Ct. 1171 (1998); Brock v. Brown, 10 Vet. App. 155, 160-61 (1997). However, the Veteran's service treatment records do not show the Veteran experienced any in-service right knee injury, nor has the Veteran made any assertion to that effect. Thus, the second Hickson element is not satisfied and service connection is precluded on a direct basis as well.

Accordingly, service connection for right knee DJD is not warranted.

Service Connection - Back

The Veteran asserts that his present back disability is the result of his service-connected scar, residuals of a shell fragment wound of the right calf and ankle. 

The Veteran has a current diagnosis of DJD and DDD of the spine, as well as Grade 1 spondylolisthesis of L4 on L5, satisfying the first Wallin element. Moreover, the Veteran is service-connected for scar, residuals of a shell fragment wound of the right calf and ankle, thereby meeting the second Wallin element.

The Veteran was afforded VA examinations in January 2010 and October 2014. After examining the Veteran, the October 2014 VA examiner concluded that the Veteran's back disability was less likely than not caused or permanently aggravated by his service-connected scar, residuals of a shell fragment wound of the right calf and ankle. The examiner reported that the weight of medical literature did not support a relationship between residuals of a shell fragment wound of the right calf and ankle and the later development of lumbosacral DDD. Moreover, the examiner reported that there was no showing of a back disability at discharge, nor was one shown until many years after service. The examiner reiterated that there was no objective evidence of a significant gait abnormality or leg length discrepancy that would be sufficient to cause biomechanical abnormalities, and that the Veteran's residuals were not severe enough to cause such a biomechanical abnormality, or permanently aggravate his back disability. The examiner also stated that the Veteran's current degenerative arthritis of the spine with spondylolisthesis was most likely due to age-related changes, occupational or sports-related activities, repetitive back stresses or activities, obesity, lifestyle, and genetic factors. 

The Board considered the Veteran's lay statements asserting a relationship between his service-connected residuals and his back disability. Specifically, the Veteran asserted that he walked with a limp for several years which was the result of his service-connected residuals, and that his back disability is due to an irregular gait caused by greater strain. See October 2007 and January 2008 statements. Moreover, the Veteran asserted that he was told by Dr. Waters, a physician who treated him following his right leg injuries during service that he would walk with an altered gait for the rest of his life. See December 2008 statement and May 2010 VA Form 9. With respect to the statements regarding the etiology of his back disability, as noted above, the Veteran as a layperson has not been shown to be capable of making medical conclusions. See Jandreau, 492 F.3d 1372 (Fed. Cir. 2007); see also Layno, 6 Vet. App. 465 (1994). Moreover, as to the Veteran's statements regarding statements provided by Dr. Waters, the Board reiterates that the Veteran's treatment records for the period in question, including those from Dr. Waters, contain no mention of a limp or irregular gait resulting from his in-service injuries. His June 1968 discharge note indicated that the Veteran was discharged to duty with "all wounds well-healed;" no mention of a limp or altered gait was made. Additionally, the Veteran's June 1969 separation examination contained no indication of an irregular gait or limp. Moreover, a December 1969 VA examination report indicated the Veteran had no loss of motion in his right ankle or leg, and that there was "no disability whatsoever." Given the Veteran's lack of demonstrated medical expertise, the Board finds the opinion of the October 2014 VA examiner to be the most probative evidence of record regarding the relationship between the Veteran's service-connected residuals and his claimed back disability.

The Board also considered whether service connection was warranted with proof of direct causation. Combee v. Brown, 34 F.3d 1039, 1042 (Fed. Cir. 1994); Ramey v. Brown, 9 Vet. App. 40, 44 (1996), aff'd sub nom. Ramey v. Gober, 120 F.3d 1239 (Fed. Cir. 1997), cert. denied, 118 S. Ct. 1171 (1998); Brock v. Brown, 10 Vet. App. 155, 160-61 (1997). However, the Veteran's service treatment records do not show he experienced any in-service back injury, nor has the Veteran made any assertion to that effect. Thus, the second Hickson element is not satisfied and service connection is precluded on a direct basis as well.

Accordingly, service connection for lumbosacral degenerative arthritis with spondylolisthesis is not warranted.

Increased Rating - PTSD

Disability ratings are assigned, under a schedule for rating disabilities, based on a comparison of the symptoms found to the criteria in the rating schedule. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. Part 4 (2014). Disability evaluations are determined by evaluating the extent to which a Veteran's service-connected disability adversely affects her ability to function under the ordinary conditions of daily life, including employment, by comparing her symptomatology with the criteria set forth in the ratings schedule.

Ratings are based on the average impairment of earning capacity. Individual disabilities are assigned separate Diagnostic Codes. See 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. § 4.1 (2014). If there is a question as to which evaluation to apply to the Veteran's disability, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2014).

In considering the severity of a disability, it is essential to trace the medical history of the Veteran. 38 C.F.R. §§ 4.1, 4.2, 4.41 (2014). Consideration of the whole recorded history is necessary so that a rating may accurately reflect the elements of disability present. 38 C.F.R. § 4.2 (2014); Peyton v. Derwinski, 1 Vet. App. 282 (1991). Although the regulations do not give past medical reports precedence over current findings, the Board is to consider the Veteran's medical history in determining the applicability of a higher rating for the entire period in which the appeal has been pending. Powell v. West, 13 Vet. App. 31, 34 (1999). Staged ratings are appropriate whenever the factual findings show distinct periods in which a disability exhibits symptoms that warrant different ratings. Hart v. Mansfield, 21 Vet. App. 505, 509-510 (2007).

In determining the applicable disability rating, pertinent regulations do not require that all cases show all findings specified by the Rating Schedule; rather, it is expected in all cases that the findings be sufficiently characteristic as to identify the disease and the resulting disability, and above all, to coordinate the impairment of function with the rating. 38 C.F.R. § 4.21 (2014).

Analysis

The Veteran's PTSD was evaluated as 30 percent disabling prior to October 21, 2014, and 50 percent disabling thereafter, under Diagnostic Code 9411. See 38 C.F.R. § 4.130 (2014). The Veteran seeks a higher rating.

The General Rating Formula for Mental Disorders provides, in pertinent part:

Occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events).........30

Occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships.........50.

Occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships.........70.

Total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or name.........100.

38 C.F.R. § 4.130, Diagnostic Code 9411 (2014).

Ratings are assigned according to the manifestation of particular symptoms. However, the use of the term "such as" in 38 C.F.R. § 4.130 (2014) demonstrates that the symptoms after that phrase are not intended to constitute an exhaustive list, but rather are to serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular rating. Mauerhan v. Principi, 16 Vet. App. 436 (2002). Accordingly, the evidence considered in determining the level of impairment under § 4.130 (2014) is not restricted to the symptoms provided in the diagnostic code. Instead, VA must consider all symptoms of a Veteran's condition that affect the level of occupational and social impairment, including, if applicable, those identified in the AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. 1994) (hereinafter DSM-IV). Id. Accordingly, while each of the examples needs not be proven in any one case, the particular symptoms must be analyzed in light of those given examples. Put another way, the severity represented by those examples may not be ignored.

Additionally, a Global Assessment of Functioning (GAF) score is often used by treating examiners to reflect the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." See Richard v. Brown, 9 Vet. App. 266, 267 (1996).

A score of 21-30 is indicated when behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home or friends). 

A GAF score of 31 to 40 is indicative of some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or any major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

GAF scores between 41 and 50 reflect serious symptoms, (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning, (e.g., no friends, unable to keep a job). 

GAF scores between 51 and 60 reflect moderate symptoms, (that is, flat affect, circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, contacts with peers or co- workers).

An examiner's classification of the level of psychiatric impairment, by words or by a score, is to be considered, but is not determinative of the percentage rating to be assigned. VAOPGCPREC 10-95. The Board must assess the credibility and weigh all the evidence, including the medical evidence, to determine its probative value, accounting for evidence that it finds to be persuasive or unpersuasive, and providing reasons for rejecting any evidence favorable to the claimant. Madden v. Gober, 125 F.3d 1477, 1481 (Fed. Cir. 1997), cert denied, 523 U.S. 1046 (1998); Wensch v. Principi, 15 Vet. App. 362, 367 (2001).

According to a July 2010 VA medical record, the Veteran reported hearing voices telling him to hurt or kill himself. He was assessed to be a "less than imminent" risk of suicide. The clinician noted the Veteran's statement that he observed a voice telling him of opportunities to harm himself. He said that after hearing the voices, he questioned himself as to why he would even consider hurting himself, and said that he "pulls back." 

In August 2010, the Veteran reported frequent suicidal ideation with thoughts of crashing his bike or car, but he was not sure why he had not tried to do so yet. He did not want to discuss any details after reportedly not receiving any benefit from a previous course of PTSD treatment at Fort Thomas. The Veteran reported sleeping 4 to 5 hours per night and said he was always tired and irritable with frequent mood lability. The Veteran was described as a "chronic suicide risk," but without imminent plans to hurt himself.

In December 2010, the Veteran reported that more than half the time he felt down, depressed or hopeless, had little interest or pleasure in doing things, and had trouble falling or staying asleep. He said that nearly every day, he felt tired and had little energy, felt bad about himself or viewed himself as a failure, exhibited either very slow or rapid, fidgety behavior, and thought he would be better off dead or considered hurting himself. He indicated that these problems made it "very difficult" to work, take care of things at home, and get along with others. On evaluation, the clinician noted the Veteran was dressed casually, was well-groomed, and had a full range of affect. He was humorous and exhibited no anger. His eye contact was good, and he was less guarded. He reported having more control over suicidal thoughts and resisting rage outbursts, but noted that he still had down days, fatigue, and lapses in attention.

Reports from January and February 2011 indicate the Veteran had fewer thoughts of death, felt more hope, and was more engaged socially. He was noted to be composed, have full range of affect, made good eye contact, and was coherent. He also indicated he was not feeling down, depressed, or hopeless at all. 

On March 10, 2011, the Veteran was voluntarily admitted to a VA hospital for ongoing depression and suicidal ideation following a work-related motor vehicle accident. Immediately following the accident, the Veteran feared losing his job and reported thinking of ending his life once he left work for the day, and experienced flashbacks. Upon admission, the Veteran was alert and oriented, and his affect was sad with a depressed mood. He had appropriate eye contact but it was limited because he was deep in thought. He was dressed appropriately and his grooming and hygiene were good. The rate and tone of his speech were normal. His thought process was linear and focused on his present circumstances, and his thought content was relevant and informative. No perceptual disturbances were present, and judgment and insight were appropriate given the current circumstances. He was assigned a GAF score of 40, and he was noted to be at imminent risk of suicide. 

Over the course of the hospitalization, the Veteran reported that his mood had improved. He was observed to become more calm and cooperative. Subsequent evaluations indicated the Veteran had a congruent affect, full in range, and that his mood continued to improve. Mild anxiety was noted at times. He had regular tone, rate, and volume of speech, and no delusions, ruminations, or obsessions were observed, but the Veteran endorsed some mild paranoia. He denied further flashbacks. He had no homicidal ideation, nor did he have any audio or visual hallucinations. He reported intermittent suicidal ideation, and said that when it was present he would talk to his wife or go to a hospital before acting. His memory and abstraction were intact, and his judgment and insight were good. His GAF was 55 throughout the remainder of the hospitalization. The Veteran was discharged on March 18.

The Veteran was afforded a VA examination in April 2011. He reported that he had good work relationships, but stayed mostly to himself. He described having good relationships with his children and siblings. He also noted that he was the treasurer of the Purple Hearts Club and attended monthly meetings, but otherwise did not socialize much. He reported mild difficulties in managing his anger and irritability and stated that he snapped at others about once per month. He said he argued with his wife and had "fits of rage," but also stated "I never take it out on her." Instead, he said he took out his aggression on inanimate objects. He said he felt down occasionally but that medication helped, and that he was irritable daily. He reported that hypervigilance made sleep difficult; he also reported feelings of worthlessness and excessive guilt. He also endorsed mild problems with memory, attention, and concentration. He denied panic attacks or markedly diminished interest in most activities. He reported that most of the time he felt detached and had a restricted affect. Moreover, he reported getting up in the middle of the night with his gun to "check noises," and said that "I just always keep myself ready because I'm going to kill some people if they pull stuff around me." 

Upon evaluation, the Veteran was appropriately dressed and did not exhibit problems with hygiene or self-care. He was alert and oriented and his behavior was cooperative. He had poor eye contact, but his speech rate, volume, and tone were unremarkable. He communicated well. His mood was mildly depressed, and his affect was depressed; the Veteran was tearful at different points during the interview. His thought process and content were unremarkable, and he showed no signs of delusions or hallucinations at the time of the examination. He denied suicidal or homicidal ideation, plan, or intent at the time of examination, but noted he had homicidal ideation in the past; he also said that he had suicidal ideation once a week but no intent or plan to follow through. The examiner noted the Veteran showed no signs of inappropriate behavior. The examiner assigned a GAF score of 65, and opined that the Veteran's PTSD had a mild impact on his social and occupational functioning.

Treatment records from July 2011 indicate that the Veteran was noted to have occasional loss of impulse control, which occurred when confronted by conflict or an inability to resolve an interpersonal problem. In September 2011, the Veteran reported his depressive experiences had grown worse; he said he was ready to give up treatment and had all but withdrawn from everyone but his wife and VA. His mood was noted to be moderately to severely depressed, with a congruent affect. The clinician also noted that the Veteran's anxiety increased with sense of loss of control in interpersonal situations, and that the best solution was to isolate the Veteran to decrease the chance of conflicts and exploding. Moreover, the examiner noted that the Veteran's ability to tolerate dysphoric emotional responses, such as feeling helpless or inadequate, "seemed fairly low."

According to a July 2012 VA medical records, the Veteran stated continued to have trouble sleeping and disliked crowds. He noted difficulties with his wife were causing added stress. He said he heard noises and walked around his house with his gun due to paranoia. He said he experienced flashbacks. He also reported feeling worthless and on edge, and said his suicidal ideation "comes and goes" but that it occurred most days; he felt his level of "intent" to kill himself was a "6" out of 10, though he said he had not rehearsed or practiced methods for doing so. He said at other times he felt very angry and wanted to hurt others. He endorsed road rage, and said that he felt like he would eventually "do something." He was noted to be a "less than imminent" risk of suicide and was assigned GAF scores of 42 and 45. 

The Veteran attended a PTSD support group from July 2012 through July 2013. Treatment notes indicate the Veteran was alert, oriented to person, place, time, and situation. He spoke at a normal rate, volume, and tone, and his thought process was linear and future oriented. His thought content was absent of delusional ideation, obsessive thoughts, and suicidal / homicidal ideation, plan, or intent, though suicidal ideation was noted at the time the Veteran began attending group therapy. No evidence of hallucinatory perceptions was indicated. His GAF scores ranged between 40 and 55. 

The Veteran was afforded a VA examination in October 2014. The Veteran reported that his relationship with his wife had "ups and downs," and that they "go through the motions" due to the couple not having any intimate relations, but that he had good relationships with his children. The Veteran reported he had one close friend he saw occasionally, and that he has other associates or acquaintances rather than friends. He said he temporarily lost his job after the March 2011 car accident, but was able to get the job back; nevertheless, he opted to remain on sick leave and retire in July 2011. He reported that when he forgot to take his medication, he became aggressive, irritable, depressed, paranoid, and anxious. He indicated he still had road rage and wanted to get out and fight other motorists, going so far to follow another motorist, but that others did not wish to fight him. He noted that he did not have panic attacks in the recent past, and that his interest was low most days. He denied problems with hygiene or self-care. He complained of mild memory, attention, and concentration problems, and said he felt down and worthless at times. He reported that his suicidal thoughts "come and go." He denied hallucinations other than in flashbacks. 

On evaluation, the Veteran was casually, cleanly, and appropriately dressed. He was alert and oriented, and his behavior was cooperative though he made minimal eye contact and his head was downcast throughout the examination. Psychomotor activity was normal, but the Veteran's speech was somewhat mumbled and low. His mood was depressed and his affect was blunted but congruent. His thought processes and content were unremarkable. There were no signs of delusions or hallucinations, though the Veteran was noted to have passive transient suicidal thoughts. The examiner observed no inappropriate behavior. The examiner also noted the Veteran had anxiety, suspiciousness, chronic sleep impairment, mild memory loss, such as forgetting names, directions, or recent events, irritable behavior with angry outbursts, hypervigilance, problems with concentration, sleep disturbance, and difficulty in establishing and maintaining effective work and social relationships. The examiner advised that the Veteran's treatment notes suggested he was doing better than he presented during the present examination. She concluded by stating that the Veteran's PTSD was moderately severe, and that it caused moderate occupational and social impairment. 

As to functional impairment, the examiner stated that the Veteran's ability to perform day-to-day activities, especially in a work setting, was mildly impaired by his depressed mood and lack of motivation; his ability to interact appropriately with others was moderately impaired. Moreover, the Veteran had few close relationships, was isolative, and when working at the post office, often argued with coworkers and supervisors. His impulse control was deemed normal. His ability to accept supervision and criticism was mildly impaired. Lastly, his flexibility, concentration, and memory were deemed mildly impaired. The examiner characterized the Veteran's PTSD as resulting in occupational and social impairment with reduced reliability and productivity. 

The Board also considered lay evidence submitted by the Veteran and his wife. In particular, the Veteran's wife reported that the Veteran went days at a time without cleaning up, shaving, or getting a haircut. She said they were not having marital problems and that they were quite happy. She noted that he was unable to work at all because he got "too upset with things," and "flew off the handle" at times. She said he did not go out at all unless he had to, and did not like crowded places. She added that he felt a need to sit where he could see everyone in the room, and that she lived in fear that she would come home and find that he had hurt himself. See June 2013 statement. 

Based on the foregoing, the Board finds that the Veteran's symptomatology more closely approximates that which is contemplated by the 70 percent rating criteria under Diagnostic Code 9411, for the entire period on appeal. The Board found particularly persuasive the Veteran's reports of and treatment for chronic suicidal ideation. Although the Veteran denied suicidal ideation at points, he also reported passive ideation throughout the appeal period; he frequently discussed passive suicidal ideation occurring at times on a daily basis, as well as his thoughts about how he could effectuate his ideas. See, e.g., March 2011 VA hospitalization records, April 2011 VA examination report, and July 2012 VA medical records. Additionally, the Board found noteworthy the severity of the Veteran's reported irritability, in particular his statement that he had "fits of rage," and would take out his anger on inanimate objects, as well as his reports of severe road rage that resulted in him following another driver for an indeterminate period of time. See April 2011 VA examination report and October 2014 VA examination report, respectively. Moreover, the Board noted the Veteran's report of walking around his house at night with a loaded firearm to "check noises" and that he was prepared to "kill some people if they pull stuff." The Board was also persuaded by the September 2011 clinician who stated that the best solution to the Veteran's PTSD symptoms was to isolate him to decrease the chance of conflicts and exploding. This suggests a serious level of impairment consistent with the 70 percent rating criteria.

The Board acknowledges that the April 2011 and October 2014 VA examination reports did not note all of the symptoms enumerated in the 70 percent rating criteria, and that the October 2014 VA examiner characterized the Veteran's PTSD symptoms as resulting in occupational and social impairment with reduced reliability and productivity. Given the evidence described in the preceding paragraph, however, the Board finds that the Veteran's symptomatology more closely approximates occupational and social impairment, with deficiencies in most areas. Notably, the Veteran has had chronic suicidal ideation, and his mood has been characterized largely by severe depression, anxiety, and irritability. Although the reports from the Veteran's weekly PTSD group therapy sessions suggest a less severe level of disability, a point noted by the October 2014 VA examiner, the Board is also aware that the Veteran reported feeling unable to open up to other people, even those with whom he shared a bond through the group therapy sessions or knew before the war. See January 2013 VA medical record. From these findings, the Board concludes that the Veteran's symptoms approximate those contemplated by a 70 percent disability rating. 

The Board finds that for the period on appeal, the preponderance of the evidence does not show that Veteran's PTSD symptoms are of such severity as to result in total occupational impairment. At no time has the Veteran been shown to have gross impairment in thought processes or communication, persistent delusions or hallucinations, grossly inappropriate behavior, persistent danger of hurting self or others; disorientation to time or place, or memory loss for names of close relatives, own occupation, or own name; or symptoms of a similar nature, duration, and scope. The Board notes that in her July 2013 statement, the Veteran's wife indicated the Veteran went days at a time without cleaning up, shaving, or getting a haircut. However, at no other point in the record has there been any indication that the Veteran exhibited an inability to maintain a minimum level of personal hygiene, and he expressly stated he had no such difficulties during his October 2014 VA examination. For these reasons, the Board finds that a disability rating in excess of 70 percent is not warranted at any point during the appeal period.

Extraschedular Consideration

The Board has also considered whether the Veteran is entitled to referral for compensation on an extraschedular basis. Ordinarily, the VA Schedule will apply unless there are exceptional or unusual factors, which would render application of the schedule impractical. See Fisher v. Principi, 4 Vet. App. 57, 60 (1993).

According to the regulation, an extraschedular disability rating is warranted based upon a finding that the case presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization that would render impractical the application of the regular schedular standards. See 38 C.F.R. § 3.321(b)(1) (2014). An exceptional case is said to include such factors as marked interference with employment or frequent periods of hospitalization as to render impracticable the application of the regular schedular standards. See Fanning v. Brown, 4 Vet. App. 225, 229 (1993).

Under Thun v. Peake, 22 Vet App 111 (2008), there is a three-step inquiry for determining whether a veteran is entitled to an extraschedular rating. First, the Board must determine whether the evidence presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. Second, if the schedular evaluation does not contemplate the Veteran's level of disability and symptomatology and is found inadequate, the Board must determine whether the Veteran's disability picture exhibits other related factors such as those provided by the regulation as "governing norms." Third, if the rating schedule is inadequate to evaluate a Veteran's disability picture and that picture has attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service to determine whether, to accord justice, the Veteran's disability picture requires the assignment of an extraschedular rating.

With respect to the first prong of Thun, the evidence in this case does not suggest an exceptional disability picture for which the available schedular evaluation for the service-connected disability may be inadequate. 

The Veteran's PTSD has been manifested by frequent depression (at times, severe), anxiety, and irritability, chronic passive suicidal ideation, angry outbursts, strained social relationships and an inability to trust or grow close to others, sleep impairment, mild difficulty with concentration, attention, and memory, more closely approximating occupational and social impairment with deficiencies in most areas. Thus, the assigned rating contemplates the Veteran's symptomatology and a higher rating under the criteria is not warranted. See Johnson v. Brown, 9 Vet. App. 7 (1996). Moreover, as to the second Thun element, the evidence does not suggest that any of the "related factors" are present. Although the Veteran was hospitalized once for his PTSD, a single occasion does not rise to the level of "frequent," and although the Veteran missed several days of work due to this hospitalization, the record does not show the Veteran's PTSD caused "marked" interference with employment.

The Board also notes that a Veteran may be awarded an extraschedular rating based upon the combined effect of multiple conditions in an exceptional circumstance where the evaluation of the individual conditions fails to capture all the service-connected disabilities experienced. Johnson v. McDonald, 762 F.3d 1362 (2014). The Veteran has at no point during the current appeal indicated that he believes the assigned schedular ratings for his PTSD, bilateral hearing loss and tinnitus, or service-connected scar, residuals of a shell fragment wound of the right calf and ankle to be inadequate or that the schedular criteria do not adequately describe or reflect his symptomatology. Therefore, referral for consideration of an extraschedular evaluation on this basis is not warranted.


ORDER

Entitlement to service connection for a right knee disability is denied.

Entitlement to service connection for a back disability is denied.

For the entire period on appeal, entitlement to a disability rating of 70 percent, but no higher, for PTSD is granted.



REMAND

In the July 2014 remand, the Board directed the AOJ to obtain an opinion addressing whether the Veteran's erectile dysfunction was caused or aggravated by his service-connected PTSD, including any medication taken for PTSD. The Veteran was provided a VA male reproductive system examination in October 2014. Although the examiner rendered a negative opinion, the examiner's conclusion was inconsistent with his rationale. Specifically, the examiner stated there was nothing in the record nor in medical literature to suggest a relationship between the Veteran's PTSD or medications for it and his erectile dysfunction. However, the examiner also stated that the Veteran's erectile dysfunction was most likely caused by or a result of, inter alia, "psychogenic and psychosocial causes with PTSD / depression." The examiner did not reconcile this apparent conflict. Thus, the opinion is inadequate for deciding the Veteran's claim. The Board hastens to add that the AOJ did not adjudicate the Veteran's erectile dysfunction claim in the March 2015 Supplemental Statement of the Case. 

The Board also directed the AOJ to obtain an addendum opinion on whether the Veteran's left knee was permanently aggravated by service-connected disability. However, the Board notes that no opinion has been obtained addressing the question of whether the Veteran's left knee disability was directly caused or related to active service. In this regard, the Board notes that the Veteran on several occasions reported that he received a shrapnel injury in his left knee in December 1967. See November 2007 and April 2008 statements. Moreover, the Veteran's Purple Heart award indicates he was injured twice in combat during service, one occasion of which was December 1967. Although the Veteran's service treatment records do not indicate a shrapnel injury to the left knee, 38 U.S.C.A. § 1154(b) provides that for combat Veterans, VA shall accept as sufficient proof of service-connection of any injury alleged to have been incurred in such service satisfactory lay or other evidence of service incurrence of such injury, if consistent with the circumstances, conditions, or hardships of such service. Thus, an opinion must be obtained addressing whether the Veteran's current left knee disability was caused by his in-service left knee injury. 

Lastly, when evidence of unemployability is submitted during the course of an appeal from an assigned disability rating, a claim for entitlement to a TDIU will be considered to have been raised by the record as "part and parcel" of the underlying claim. Rice v. Shinseki, 22 Vet. App. 447, 453-54 (2009). In a June 2013 statement, the Veteran's wife indicated that his PTSD had affected his employability. The issue of a TDIU has therefore been raised and is before the Board. This aspect of the claim must be developed. Moreover, as the Board is remanding the erectile dysfunction and left knee claims for additional development, the outcome of which could influence his eligibility for TDIU benefits, the Board finds the claim is inextricably intertwined and must too be remanded. See Harris v. Derwinski, 1 Vet. App. 180, 183 (1991).

Accordingly, the case is REMANDED for the following actions:

1. Obtain any outstanding VA medical records and associate them with the claims file. All attempts to obtain these records must be documented in the claims file.

2. Return the case to the October 2014 VA examiner who performed the orthopedic examination, or if unavailable a suitable substitute. If the clinician determines that another examination would be helpful, the Veteran should be scheduled for a new examination. The written report must reflect that the electronic record was reviewed. 

Based on the review of the Veteran's electronic record, the examiner is asked to provide an opinion on whether it is at least as likely as not (a probability of 50 percent or greater) that any currently diagnosed left knee disability was incurred in or caused by active service, to include the Veteran's reported shrapnel injury to the left knee.

In formulating the opinion, the term "at least as likely as not" does not mean "within the realm of possibility." Rather, it means that the weight of the medical evidence both for and against the claim is so evenly divided that it is as medically sound to find in favor of the claim as it is to find against.

The underlying reasons for any opinion expressed must be provided. If the examiner is unable to offer the requested opinion, it is essential that the examiner offer a rationale for the conclusion that an opinion could not be provided without resort to speculation, together with a statement as to whether there is additional evidence that could enable an opinion to be provided, or whether the inability to provide the opinion is based on the limits of medical knowledge. See Jones v. Shinseki, 23 Vet. App. 382 (2011).

3. Return the case to the October 2014 VA examiner who performed the male reproductive system examination or a suitable substitute for an addendum opinion. If the clinician determines that another examination would be helpful, the Veteran should be scheduled for a new examination. The written report must reflect that the electronic record was reviewed. 

Based on the review of the Veteran's electronic record, the examiner is asked to provide an opinion on the following:

a) Whether it is at least as likely as not (50 percent or greater probability) that any diagnosed prostate disorder, to include erectile dysfunction, was caused by service connected PTSD, to include medication for the treatment thereof.

b) Whether it is at least as likely as not (50 percent or greater probability) that any diagnosed prostate disorder, to include erectile dysfunction, was aggravated (i.e., permanently worsened beyond the natural progression) by service connected PTSD, to include medication for the treatment thereof.

If aggravation is found, the examiner should address the following medical issues: (1) the baseline manifestations of the Veteran's claimed disability found prior to aggravation; and (2) the increased manifestations which, in the examiner's opinion, are proximately due to the service-connected PTSD or medication thereof.

In formulating the opinions, the term "at least as likely as not" does not mean "within the realm of possibility." Rather, it means that the weight of the medical evidence both for and against the claim is so evenly divided that it is as medically sound to find in favor of the claim as it is to find against.

The underlying reasons for any opinion expressed must be provided. If the examiner is unable to offer the requested opinions, it is essential that the examiner offer a rationale for the conclusion that an opinion could not be provided without resort to speculation, together with a statement as to whether there is additional evidence that could enable an opinion to be provided, or whether the inability to provide the opinion is based on the limits of medical knowledge. See Jones v. Shinseki, 23 Vet. App. 382 (2011).

4. Conduct any other development deemed necessary for the adjudication of the TDIU claim.

5. Thereafter, complete any other development deemed necessary, and then readjudicate the Veteran's claims. If any determination remains unfavorable to the Veteran, he and his representative should be furnished a Supplemental Statement of the Case which addresses all evidence associated with the claims file since the last Statement of the Case. The Veteran and his representative should be afforded the applicable time period in which to respond.

The Veteran has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

These claims must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).




______________________________________________
MICHAEL A. PAPPAS
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs